*SEE CONCURRING OPINION*

Filed 5/28/20; Transferred from Supreme Court 9/23/20 and Certified for Publication 9/30/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HOOKED MEDIA GROUP, INC., | H044395, H044782 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-14-CV-265819) |
| v. | |
| APPLE INC., | |
| Defendant and Respondent. | |

Hooked Media Group is a startup company that Apple expressed interest in acquiring. Representatives from each company met to explore a possible acquisition but Apple ultimately passed. Then three of Hooked's most important employees left—to work for Apple. Hooked sued for fraud; misappropriation of trade secrets; interference with contract and prospective economic advantage; aiding and abetting breach of fiduciary duty; unfair business practices; and unjust enrichment. The trial court granted summary judgment for Apple. We will affirm.

## I. BACKGROUND

Viewing the evidence in the light most favorable to Hooked, the following facts are undisputed. Founded in 2008 and based in San Francisco, Hooked Media Group developed a recommendations app for mobile devices. It gives users personalized suggestions for other apps they might like based on usage patterns and similar data. By 2013, Hooked's CEO and investors wanted to sell the business to a larger company. The

CEO secured a meeting with representatives from Apple, Inc., who showed enough interest that a second meeting was scheduled.

After the second meeting, Hooked's CEO learned that Apple was not interested in buying the company for its technology or market share. But, as an Apple representative explained, it might want to acquire Hooked solely so Hooked's employees (and in particular certain engineers) would become Apple employees—an "acqui-hire," in Silicon Valley jargon. Hooked's CEO declined, saying there were other acquisition possibilities she would like to see play out.

Hooked did not find a buyer, and in the meantime it was running short on cash. The CEO settled on a new plan: Hooked would "sell" three engineers to Apple (including a longtime employee who served as Chief Technical Officer) and continue operating the less technical aspect of its business, relating to advertising. Hooked's CEO pitched the idea to Apple, providing background information about the engineers and sending their resumes. Apple responded that it might consider paying a "finder's fee" for the engineering team, depending on "who would be coming over."

In the end, Apple never paid Hooked a finder's fee, or any compensation at all. Instead, Apple contacted two of the engineers directly and hired them. Hooked's Chief Technical Officer stayed but as it turned out, he too was in negotiations with Apple to be hired. His employment at Hooked ended soon after in what is best described as a mutual decision: he tendered his resignation when the CEO notified him he was fired. Apple hired him just over a week later. Before starting there, he got an e-mail from Hooked's CEO demanding that he return all Hooked company property, including copies of confidential technical information kept on his personal computer. The CEO also e-mailed Apple's general counsel expressing concern about former Hooked employees retaining confidential information. Apple responded that it had no desire to use another company's trade secrets and would facilitate the return of all confidential information the former Hooked employees had.

2

Several months later, Hooked sued its former Chief Technical Officer and Apple. The complaint alleged that in hiring the engineers, Apple engaged in misappropriation of trade secrets, unfair competition, and other wrongs. The trial court granted summary judgment for Apple. Hooked then dismissed without prejudice the causes of action against its former CTO to allow entry of judgment and this appeal.

## II.     DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) When a defendant moves for summary judgment, the defendant "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar,* at p. 851.)

A defendant may satisfy its initial burden by either conclusively negating an element of each of the plaintiff's causes of action or, alternatively, by showing "that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Aguilar*, *supra*, 25 Cal.4th at pp. 853-854.) " 'Once the defendant … has met that burden, the burden shifts to the plaintiff … to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff … may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' " (*Aguilar,* at p. 849.)

Ultimately, the defendant "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. … There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

We also note an overarching principle coloring much of our analysis: broadly speaking, Apple was free to hire any of Hooked's employees at any time, and those employees were free to leave to work for Apple, without any compensation to Hooked. (See *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1150, citing *Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 255 [no legal wrong is committed when a company solicits and hires away its competitor's employees; absent some independent illegal act, the "interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers."].) The ultimate question is whether Hooked can show Apple did something that transformed ordinary free market competition into an actionable legal wrong.

### 1. Fraud and Negligent Misrepresentation

The elements of Hooked's fraud cause of action are that the defendant made a false representation about a past or existing fact with the intent to deceive, and the plaintiff detrimentally relied on the representation. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) The elements of negligent misrepresentation are the same, except for the intent to deceive; for negligent misrepresentation it is enough that the defendant made a representation without a reasonable basis for believing it to be true. (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 792.)

4

Hooked alleges three separate misrepresentations: (1) Apple would keep confidential any information it got from Hooked; (2) Apple would not use any confidential information it got from Hooked; and (3) Apple would deal directly and negotiate only with Hooked's CEO regarding hiring the Hooked engineers. Those representations all involve future events, not past or existing facts. Broken promises regarding future conduct may be actionable as promissory fraud, but only if the promisor did not actually intend to perform at the time the promise was made. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 159. ) For Hooked to survive summary judgment, there must be evidence that when Apple gave the three assurances about its future conduct it did not intend to honor them. We do not find any such evidence in the record. There are no facts that would allow one to reasonably infer that Apple's initial intent was anything other than to negotiate an acquisition (even if only an "acqui-hire"). An internal e-mail sent shortly after the second acquisition meeting indicates that at the time (early August 2013), Apple wanted to "interview the team and explore an aqui-hire type scenario," but would refrain from doing so without the agreement of Hooked's CEO. Later e-mails show Apple did not change its mind and decided to approach the engineers directly until the end of October 2013, when Apple came to the realization that since it had no agreement with Hooked, it could talk directly with the employees if they were interested. The absence of evidence indicating Apple intended to deceive when it made the promises means that Apple satisfied its initial burden to show a lack of evidence to support a necessary element of the fraud cause of action.

Hooked asserts it met its burden of producing evidence to create a triable issue regarding the element of intent to deceive. But Hooked did not meet that burden because it points only to evidence showing the alleged promises were made and then broken. Breaking a promise is not itself actionable. There is no evidence from which a reasonable trier of fact could conclude that Apple did not intend to perform at the time

5

the promises were made. Summary adjudication was therefore proper on the fraud cause of action. As there is no recognized cause of action for a negligent misrepresentation based on a false promise, summary adjudication was properly granted on that basis, as well. (*Tarmann v. State Farm Mut. Auto. Ins. Co.*, *supra*, 2 Cal.App.4th 153, 159.)

### 2. Misappropriation of Trade Secrets

Hooked alleges that Apple misappropriated trade secrets in violation of the Uniform Trade Secrets Act (UTSA; Civil Code, § 3426 et seq.). To prove misappropriation under the UTSA, a plaintiff must establish that the defendant improperly acquired or used trade secret information. (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1668.) The plaintiff must also show it made reasonable efforts to maintain the confidentiality of the purported trade secret. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 57.) There are two categories of trade secrets Hooked accuses Apple of misappropriating: (1) technical information, such as algorithms and app recommendation strategies; and (2) information about the makeup and skills of Hooked's core engineering team.

As to the first category, we see no evidence that Apple's actions meet the standard for improper use or acquisition. Hooked points to evidence showing its former employees (in particular its CTO) retained Hooked technical information, accessed it while in Apple's employ, and gave misleading statements about how much of it they had retained. But showing that the employees had the information is not sufficient to establish Apple improperly acquired or used it. (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1279 [mere possession of trade secrets by a departing employee not enough for a UTSA violation].) Nor could a trier of fact find that, by itself, a lack of candor regarding the amount of confidential information the employees kept establishes use or acquisition by Apple. As a result, Apple met its burden of showing there is no evidence to support a necessary element of the cause of action.

Hooked relies on circumstantial evidence that in its view generates an inference of trade secret use sufficient to create a triable issue of fact as to that element: its former employees were assigned to tasks at Apple similar to the work they did at Hooked and within weeks one of them produced a detailed plan for a recommendations system much like Hooked's version. Further, an expert opined that the source code for Apple's recommendations system was similar to the source code for Hooked's. That evidence does suggest the engineers drew on knowledge and skills they gained from Hooked to develop a product for their new employer—but California's policy favoring free mobility for employees specifically allows that. (See *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1464 [rejecting the "inevitable disclosure" doctrine, under which a claim for trade secret misappropriation is stated if an employee's new job will inevitably lead to reliance on the former employer's trade secrets].) Allowing an action for trade secret misappropriation against a former employee for using his or her own knowledge to benefit a new employer is impermissible because it would be equivalent to *retroactively* imposing on the employee a covenant not to compete. (*Id*. at pp. 1462–1463 ["The chief ill in the covenant not to compete imposed by the inevitable disclosure doctrine is its after-the-fact nature: The covenant is imposed *after* the employment contract is made and therefore alters the employment relationship without the employee's consent."]). For that reason, evidence that Apple hired engineers with knowledge of Hooked's trade secrets and that the engineers inevitably would have relied on that knowledge in their work for Apple does not support a claim for improper acquisition of a trade secret. Hooked did not meet its burden to show a triable issue of material fact.

Hooked also argues that Apple's production of Hooked trade secret information in response to discovery requests in this litigation shows that Apple acquired the trade secrets by improper means. But again, mere possession of information is not enough to establish improper acquisition of a trade secret. (See *FLIR Systems, Inc. v. Parrish*, *supra*, 174 Cal.App.4th 1270, 1279.) It follows that a trier of fact could not reasonably

infer there was a violation of the UTSA based solely on Apple's possession of information.

As to the second category of information Hooked identifies as a trade secret—the makeup and skills of its engineering team—there is no evidence of Hooked making reasonable efforts to maintain the secrecy of the information, as required for a claim under the UTSA. To the contrary, it intentionally disclosed much of the information in negotiations with Apple even after Apple declined to sign a nondisclosure agreement. Because no reasonable trier of fact would conclude Hooked made sufficient efforts to maintain the secrecy of the information, Hooked did not meet its burden of showing a triable issue and the UTSA cause of action fails.

### 3. Aiding and Abetting Breach of Fiduciary Duty

Hooked alleges that Apple aided and abetted Hooked's former CTO in committing a breach of fiduciary duty. That cause of action requires evidence Apple knew the CTO was engaged in a breach of fiduciary duty and provided assistance or encouragement to aid in the breach. (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343–344.) The breach identified by Hooked is the CTO independently negotiating his hire with Apple rather than going through a process the Hooked CEO had discussed with Apple.

The parties dispute a threshold issue: whether the CTO was a corporate officer at all, which affects the scope of his fiduciary duties. Viewing the evidence in the light most favorable to Hooked, we will assume he was a Hooked officer and owed a duty of undivided loyalty. The question then becomes whether he breached that duty by pursuing a job at Apple outside of the negotiations between the companies. On that point, *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 346 is instructive. There the Supreme Court held that a corporate officer does not breach a fiduciary duty by making preparations to secure a job with a competitor: "The mere fact that the officer makes

8

preparations to compete before he resigns his office is not sufficient to constitute a breach of duty. It is the nature of his preparations which is significant. No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself." (*Id.* at p. 346.)

California's emphasis on employee mobility and freedom to compete counsels against a finding that the CTO's self-serving efforts to land a position with Apple were a breach of fiduciary duty. Although the CTO was apparently planning to move to a competitor, there is no evidence that he began competing with Hooked while still employed there. Nor did he attempt to secure benefits for Apple while still employed by Hooked (such as by soliciting Hooked's customers to transfer their business to Apple). Hooked describes a hypothetical scenario that would be closer to a breach of fiduciary duty: if the CTO, acting on behalf of Apple although still employed by Hooked, convinced the other engineers to go to work for Apple. That is similar to the facts in *Bancroft-Whitney Co. v. Glen*, where it was a breach of duty for a company president to engage in conduct "designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful." (*Bancroft-Whitney Co. v. Glen*, *supra*, 64 Cal.2d at p. 347.) But there is no evidence that happened in this case. Instead, Apple met its initial burden by producing evidence that it was Hooked's own CEO, not the CTO, who identified the engineers she thought would be useful to Apple and tried to persuade Apple to hire them. She did so expecting Hooked to be paid, of course, but Apple elected to negotiate with the engineers directly. Hooked did not produce evidence to dispute any of those facts. That the engineers chose to work for Apple even though no compensation was forthcoming to Hooked does not amount to a breach of any fiduciary duty that may have been owed to Hooked.

The duty of loyalty generally prohibits corporate officers from putting their own business interests ahead of those of their employer. But an officer seeking to better his or her own employment by going to work for a competitor presents a different situation.

9

The law generally permits an officer to pursue *that* personal advantage even though it may be detrimental to the current employer. To find a breach of fiduciary duty on this record would unduly constrain the ability of employees to make preparations to compete with their current employer. Apple therefore satisfied its initial burden, and Hooked failed to meet its burden of showing a triable issue. Summary adjudication of Hooked's aiding and abetting cause of action was properly granted.

### 4. Interference With Contract and Prospective Economic Advantage

Hooked asserted causes of action for interference with contract and interference with prospective economic advantage. Interference with contract occurs when the defendant knows about a contract between the plaintiff and a third party, and intentionally disrupts the contractual relationship. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) Interference with economic advantage is similar. It does not require a contract, but it does require the additional element that the defendant's conduct be " 'wrongful by some measure other than the fact of interference itself.' " (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393.) A defendant interferes with economic advantage by intentionally disrupting, in a way that is otherwise wrongful, an economic relationship that has a probability of future economic benefit for the plaintiff. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1154.)

Hooked contends that Apple interfered with the contract by hiring away its core engineering team, leaving it unable to meet existing contractual obligations because "there was no engineering support left." Hooked characterizes that as interference with a contractual relationship it had with another company. Hooked's inability to meet its customer obligations is evidence that Hooked was harmed by what Apple did. But to recover damages for that harm, there must first be a valid theory of liability. Hooked's theory of liability—what was done to cause the harm—is that Apple took away its

10

employees. Intentionally disrupting an employment relationship can give rise to a claim for interference with contract (even when an employee is at will and under no obligation to stay, as were the engineers here), but different rules apply.

In *Reeves v. Hanlon*, *supra*, 33 Cal.4th at p. 1151, the Supreme Court explained that "the economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." Because a company ordinarily commits no legal wrong by hiring its competitor's employees, the Court held that damages can be recovered for interference with an at-will employment contract only when the defendant also committed an independently wrongful act. (*Id.* at p. 1152.) The effect of that rule here is that *both* Hooked's claim for interference with prospective economic advantage and its claim for interference with contract require a showing that Apple committed a wrongful act other than the interference itself.

The wrongful acts Hooked identifies are fraud, misappropriation of trade secrets, and aiding and abetting breach of fiduciary duty. We have already concluded that the evidence produced by Apple indicates it did not commit those wrongs, and that Hooked did not satisfy its burden to show a triable issue of material fact on that point. It follows that none of those acts can be used to create a disputed issue of fact regarding whether there is an independent wrongful act to support Hooked's interference claims.[1] Summary adjudication of both interference causes of action was therefore appropriate.

---

[1] Hooked asserts that since the trial court's order did not reach the issue of whether there was an independent wrongful act, we cannot affirm the grant of summary judgment using that reasoning without first allowing supplemental briefing. (See Code Civ. Proc. § 437c, subd. (m)(2).) But the parties have already briefed the issue of whether Apple committed the wrongful acts in question (trade secret misappropriation, aiding and abetting breach of fiduciary duty, and fraud). Because Hooked has been afforded an opportunity to present its views, no supplemental briefing is required. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 471 fn. 39; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147, fn. 7; see also Gov. Code, § 68081 [requiring supplemental

11

### 5. Unfair Business Practices

Business and Professions Code section 17200 et seq., prohibits unlawful, unfair, and fraudulent business practices.  It applies to any business practice forbidden by law, as well as those that are unfair even though not expressly prohibited by statute.  (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at p. 1143.)  Hooked bases its cause of action on fraud and misappropriation of trade secrets.  As summary adjudication of those claims was properly granted, there is no evidence from which a trier of fact could conclude Apple committed unlawful acts.

The inequity Hooked perceives is that Apple stripped it of a valuable company asset, perhaps its most valuable asset, without payment.  Apple gained the expertise of the engineers and left Hooked without the skilled labor it needed to conduct its business.  Although that accurately describes what Apple did, it was not an unfair business practice as long as it was not accomplished by unlawful means.  Enticing a competitor's employees to leave by offering better pay or more desirable terms is simply a competitive business practice.  (*Reeves v. Hanlon*, *supra*, 33 Cal.4th at p. 1151.)  The trial court was correct to summarily adjudicate the unfair business practices claim.

### 6. Unjust Enrichment

Hooked's complaint includes a cause of action entitled unjust enrichment.  Summary adjudication of that claim was proper because California does not recognize a cause of action for unjust enrichment.  (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793 [the phrase "unjust enrichment" does not describe a theory of recovery; it is a general principle underlying various legal doctrines and remedies].)

### B. EVIDENTIARY ISSUES

Hooked contends that the trial court erred in granting summary judgment because of two incorrect evidentiary rulings, one excluding evidence and one admitting evidence.

---

briefing only if the decision is based on an issue not briefed by any party]; Civ. Code, § 3532 ["The law neither does nor requires idle acts."].)

It challenges the trial court's decision that e-mails produced in discovery by the former CTO are protected by Apple's attorney-client privilege; and an order overruling Hooked's authentication objections to Apple's documentary evidence.

### 1. Privilege

Hooked argues that Apple waived the attorney-client privilege as to certain written communications produced during discovery by the former CTO by "its inaction when it learned that its employee [] proposed to produce a laptop that he had used while employed both at Apple and Hooked without conducting any privilege review." (See *Regents of University of California v. Superior Court* (2008) 165 Cal.App.4th 672, 679 [proponent of privilege for inadvertently produced privileged information must show reasonable steps were taken to prevent disclosure].) The parties debate whether we review the ruling under a de novo standard or for substantial evidence. "Under either standard, however, an appellant who seeks a reversal based on the erroneous exclusion of evidence in summary judgment proceedings must establish how the error resulted in a 'miscarriage of justice,' often referred to as prejudice." (*Donohue v. AMN Services, LLC* (2018) 29 Cal.App.5th 1068, 1103.) Prejudice from an incorrect ruling occurs only when it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Id*. at p. 1104.) Hooked has not explained how a different ruling on the privilege issue would lead to a more favorable result. It is therefore unnecessary to decide whether the trial court's decision on waiver was correct, as we are unable to reverse without a showing of prejudice.

### 2. Authentication

Hooked contends the trial court erred by overruling its objections to evidence Apple submitted in support of summary judgment as not properly authenticated. The standard of review for a trial court's evidentiary rulings on summary judgment is unsettled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [declining to decide whether

13

standard is de novo or abuse of discretion].) Even applying a de novo standard as the one more favorable to Hooked, we find no error in the admission of Apple's evidence.

"Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) Relying on *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 855, Hooked asserts that Apple's evidence was not adequately authenticated by a sworn statement from Apple's counsel that the documents were produced by Hooked and third parties during discovery. But *Serri* did not hold that an attorney's declaration that documents were obtained through discovery can never suffice for authentication. Rather, *Serri* found such a declaration inadequate because the documents at issue were unsigned handwritten notes, and there was no evidence indicating they were written by the person the proponent claimed. (*Ibid*.) The documents here are much different. They are mostly e-mails bearing clear indicia that they are what Apple claims they are. And the documents from third parties were submitted with declarations from custodians of records explaining their origin. We see nothing that would cast doubt on the authenticity of the evidence to which Hooked objects. As with any other fact, the authenticity of a document can be established by circumstantial evidence. (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) Apple's documents were authenticated both by the attorney's statement that they had been produced in discovery and by their form, which indicates authenticity. We are satisfied the trial court did not err in admitting the documentary evidence.

## C. HOOKED'S MOTION TO TAX E-DISCOVERY COSTS WAS PROPERLY DENIED

Hooked appeals a post judgment order denying its motion to tax Apple's bill of costs. Specifically, Hooked contests the trial court's refusal to strike $92,000 in e-discovery expenses claimed by Apple for the conversion of native electronic files into usable form.

14

We review the denial of a motion to tax costs for abuse of discretion. (*Doe v. Los Angeles County Dept. of Children and Family Services* (2019) 37 Cal.App.5th 675, 693.) The objecting party has the burden to show that a cost item is unrecoverable because it was not necessary to the litigation. Whether a cost was necessarily incurred presents a factual question the trial court is best suited to answer. The trial court's discretion in that regard will therefore not be disturbed on appeal so long as any findings are supported by substantial evidence. (*Ibid*.)

This litigation cannot be described as economical. Apple spent $360,765.26 in costs alone. The bill included, in addition to the challenged $92,000 e-discovery costs, over $139,000 for depositions and more than $88,000 for hotel rooms, meals, and internet access. (The trial court granted Hooked's motion to tax the hotel expenses.) Hooked makes valid arguments that the e-discovery costs may have been incurred more out of convenience than necessity. But given our deferential standard of review, reversal is not warranted. The trial court, having closely observed the litigation as it progressed over several years, was in a much better position than we are to decide whether expenses associated with managing electronic data were necessarily incurred.

## III.   DISPOSITION

The judgment and costs order are affirmed. In the interests of justice, the parties shall bear their own costs on appeal.

_____

Grover, J.


**I CONCUR:**


_____

Elia, Acting P. J.


**H044395, H044782 -** *Hooked Media Group, Inc. v. Apple Inc.*

# Mihara, J., Concurring in the Judgment.

While I agree with my colleagues that the judgment should be affirmed, I write separately to explain my analysis.

## I. Hooked's Allegations

The first amended complaint, which was the operative pleading, alleged causes of action against Apple for misappropriation of trade secrets, interference with contract, interference with prospective economic advantage, fraud, negligent misrepresentation, aiding and abetting a breach of fiduciary duty, unjust enrichment/restitution, and unfair business practices.[1]

Hooked alleged that it had "developed an innovative app discovery and monetization platform" using "proprietary machine learning technology" to provide "users customized recommendations of apps . . . ." Hooked's "app discovery platform" had been developed by Hooked's Chief Technology Officer (CTO), Chandrasekar Venkataraman, and Hooked engineers Daniel Cartoon and Paul Irvine.

In May 2013, Hooked and Apple began discussing a possible acquisition of Hooked by Apple. Apple declined to sign a non-disclosure agreement (NDA), but it repeatedly promised to maintain the confidentiality of all information Hooked shared with it. Hooked relied on this promise. At meetings with Apple, Hooked disclosed "confidential and proprietary details of its technologies" including "trade secret details of Hooked Media's business operations, its team, and its technology . . . ." In addition, Venkataraman had extensive discussions and exchanged information with

---

[1] I describe only the causes of action against Apple as the causes of action against the other defendant, Venkataraman, are not at issue in this appeal. Venkataraman's motion for summary judgment was denied.

Venkatakrishnan Sundaranatha, an Apple employee whom he had known for many years and who was involved in the negotiations.

After multiple meetings, Apple informed Hooked that Apple's plans had changed, and Apple was no longer interested in acquiring Hooked but only in hiring Venkataraman, Cartoon, and Irvine. Apple suggested that it would offer Hooked $4.5 million for an "acqui-hire." Hooked understood the value of its business to be $60 million. Apple promised Hooked that its acqui-hire negotiations would be conducted solely through Hooked's CEO.

Hooked told Apple that it could not hire Venkataraman. Apple told Hooked that it would not pay the $4.5 million but only 30 percent of the acquired engineers' salaries. Venkataraman urged Hooked's CEO to accept Apple's offer, but at the same time he was sabotaging Hooked's business. Apple proceeded to hire Cartoon and Irvine without any arrangement with Hooked or its CEO. Cartoon and Irvine gave just two days of notice to Hooked before leaving for Apple. Both of them took Hooked's confidential and proprietary information. Apple offered an even smaller, 15 percent fee to Hooked after the engineers left Hooked.

Venkataraman continued to sabotage Hooked's business, and, after Hooked's CEO confronted him, he resigned from Hooked and began working at Apple. When he left, Venkataraman removed from Hooked's computer systems many e-mails and files that Hooked needed to operate. He also took Hooked's "entire code base" and its "entire code set and documentation for every piece of technology Hooked had built since its inception in 2008." Venkataraman also created login credentials so that he could access Hooked's files after he left. He continued to access Hooked's files after he left. Venkataraman did not transition operational information to anyone at Hooked. Apple did not pay any sum to Hooked.

Based on these allegations, Hooked alleged that Apple had misappropriated Hooked's trade secrets both during the negotiations and outside the negotiations from

Venkataraman, and had used "improper means" to obtain these trade secrets because Apple had promised to keep all of this information confidential and because Apple knew that Venkataraman had a duty to Hooked to protect its information. Hooked alleged that Apple was "now using" Hooked's trade secrets "to recreate Hooked Media's technology for Apple."

Hooked's two interference causes of action alleged that Apple had interfered with Hooked's "business relationships" with HTC and Deutsche Telekom. The fraud cause of action alleged that "Apple made false promises that it would keep confidential Hooked Media's proprietary technology and information and not use confidential information disclosed to it" and that it would negotiate only with Hooked's CEO. The negligent misrepresentation cause of action was based on the same allegations as the fraud cause of action as it alleged no additional facts. Hooked's aiding and abetting breach of fiduciary duty cause of action alleged that Apple had intentionally aided Venkataraman in breaching his fiduciary duty to Hooked by offering him "employment and other consideration" in exchange for breaching his fiduciary duty to Hooked. Hooked's unjust enrichment/restitution and unfair business practices causes of action alleged no additional facts; they appeared to be derivative of the other causes of action.

## II. Procedural Background

Apple moved for summary judgment. Apple's motion was supported by evidence that Apple claimed negated an essential element of each of Hooked's causes of action. Hooked opposed Apple's motion. It argued that Apple had not met its initial burden as to any of Hooked's causes of action. Hooked also produced evidence in support of its opposition that it claimed raised triable issues of fact as to each cause of action.

3

The superior court granted Apple's summary judgment motion and entered a judgment of dismissal. The superior court found that Apple had satisfied its initial burden as to each cause of action and that Hooked had failed to raise a triable issue as to any of its causes of action.

Apple filed a memorandum of costs that sought recovery of over $92,000 in "E-Discovery Costs." Hooked filed a motion to tax that sought to tax several items of costs, including the "E-Discovery Costs." The court denied this portion of Hooked's motion to tax costs.

## III. Discussion

### A. Evidentiary Issues

#### 1. Authentication

Hooked claims that the superior court prejudicially erred in overruling Hooked's authentication objection to many of the documents that Apple relied upon to support its summary judgment motion.

"Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) "[A] writing can be authenticated by circumstantial evidence and by its contents." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.)

The documents challenged by Hooked were attached to Apple's attorney's declaration, and he had declared that these were true and correct copies of e-mails and other documents that had been produced in discovery.

Hooked's challenge to the superior court's ruling on Hooked's authentication objection is premised on this court's decision in *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830 (*Serri*). However, *Serri* is inapposite. In *Serri*, the challenged evidence consisted of more than 20 handwritten, unsigned notes that Serri claimed had

4

been written by his supervisor, Molly McDonald. (*Serri*, at p. 855.) There was no indication in the writings that the notes had been written by McDonald. (*Ibid.*) Serri argued that the fact that the notes had been produced in discovery by the defendants meant that the defendants had admitted the authenticity of the notes. (*Id.* at p. 854.)

This court rejected Serri's argument. "Unless the opposing party admits the genuineness of the document, the proponent of the evidence must present declarations or other 'evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is.' " (*Serri*, *supra*, 226 Cal.App.4th at p. 855.) Here, unlike in *Serri*, each of the documents (most of which were e-mails) itself expressly identified the author of the document, which was " "sufficient to sustain a finding' " (*ibid.*) that the document was what the proponent claimed it was.[2] Accordingly, the superior court did not err in overruling Hooked's authenticity objections.

### 2. Privilege

Hooked claims that the superior court erred in finding that Apple had not waived its attorney-client privilege as to documents found on a computer and cellphone produced by Venkataraman to Hooked during discovery.

In January 2015, Hooked filed a motion to compel Venkataraman to produce a forensic image of the laptop computer that he had used for work at Hooked. In February 2015, the court ordered Venkataraman to produce a complete forensic image of the laptop or to allow Hooked to inspect and copy the laptop. The court ordered the parties to "meet and confer to attempt to reach an agreement about treatment and protection of any privileged items . . . that may be found on the laptop." After meeting and conferring, the parties stipulated that Venkataraman would produce his cellphone and the laptop without a privilege log so long as the laptop's hard drive was

---

[2]    Hooked makes no attempt to address any particular document but simply makes a blanket argument as to all of the documents.

5

" 'designated "Highly Confidential, Attorneys' Eyes Only". . . .' " Forensic data from both devices was produced on a single hard drive.

Hooked subsequently found e-mail on the laptop that appeared to potentially be subject to attorney-client privilege, and it suspended its review of the laptop and notified Venkataraman of its discovery. Apple and Venkataraman thereafter attempted to "clawback" the contents of the laptop and cellphone. Apple claimed that Venkataraman's agreement to produce the laptop and cellphone did not waive Apple's privilege.

In May 2016, Hooked sought a determination that Apple had waived any claim of privilege as to "all documents and communications on the laptop and cellphone . . . ." The superior court found that Apple had not globally waived its privilege, but it permitted Hooked to seek rulings on any specific claims of privilege. The court subsequently ordered that the privileged information be extracted and the remainder returned to Hooked. At that time, Hooked's trial counsel said "I don't have any need for a copy with privileged information."

Because Hooked does not explain how the superior court's privilege ruling had any impact on the court's ruling on the summary judgment motion, I consider it forfeited. Given Hooked's trial counsel's assertion that he had no "need for a copy with privilege information," coupled with the court's order that the non-privileged information be given to Hooked, the record could not support such a claim.

## B. Summary Judgment

### 1. Standard of Review

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) When a defendant moves for summary judgment, the defendant "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable

6

issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, at p. 851.)

A defendant may satisfy its initial burden by either conclusively negating an element of each of the plaintiff's causes of action or, alternatively, by showing "that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Aguilar*, *supra*, 25 Cal.4th at p. 853.) " 'Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' " (*Aguilar*, at p. 849.)

Ultimately, the defendant "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

### 2. Trade Secrets Cause of Action

Hooked argues that the superior court should not have summarily adjudicated its trade secrets cause of action because Apple failed to meet its initial burden and Hooked produced evidence in opposition to Apple's motion that created a triable issue of fact.

7

Hooked alleged that Apple had misappropriated three sets of Hooked's trade secret information. One set was technical information about Hooked's product, customers, and business model. A second set was information about "the makeup, skills, and contributions" of Hooked's engineers. Hooked alleged that both of these sets of information were disclosed to Apple at the "acquisition discussions" between the two companies or were disclosed by Venkataraman to Sundaranatha during the same time period but outside of those discussions. The third set was information that Hooked alleged Venkataraman retained access to after his departure from Hooked and continued to access after he went to work for Apple. Hooked alleged that it had protected its trade secrets by requiring its employees to sign NDAs and relying on Apple's assurance that it would keep Hooked's information confidential. Hooked also alleged that Apple was "using" Hooked's trade secret information "to recreate" Hooked's "technology for Apple."

A trade secret is "information" that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).) " 'Misappropriation' " of a trade secret occurs when (1) the information is acquired by one "who knows or has reason to know" that the information "was acquired by improper means" or (2) the information is disclosed or used without consent by one who (a) "[u]sed improper means to acquire" it or (b) knew or had reason to know that the information was acquired from someone else who acquired it by improper means or that it was acquired with a duty to maintain its secrecy or limit its use. (Civ. Code, § 3426.1, subd. (b).)

Apple asserted that Hooked could not succeed on its trade secrets cause of action because Hooked's information did not qualify as a trade secret and Apple had not misappropriated any of it. As to the first of these propositions, Apple produced

8

evidence that Hooked had explicitly invited Apple to meet with Hooked employees to have "a deeper technical discussion" and then had arranged multiple meetings with Apple and disclosed Hooked's information to Apple at these meetings despite Apple declining to sign an NDA. On the misappropriation issue, Apple produced evidence that Cartoon, Irvine, and Venkataraman, the three employees who left Hooked and went to work for Apple, had not disclosed any Hooked information to Apple and had not used any Hooked information in their work for Apple. Apple also produced evidence that Sundaranatha had not acquired any of Hooked's information outside of the meetings arranged by Hooked's CEO, and that Apple had not used any Hooked information in developing any search or recommendation system used or developed by Apple.

Misappropriation occurs only where the information is acquired by improper means or disclosed or used improperly. Apple's evidence negated Hooked's misappropriation allegations by establishing that Apple had not improperly acquired or improperly used any of Hooked's trade secret information.

Hooked argues that Apple did not meet its initial burden because it failed to negate Hooked's allegation that Apple improperly acquired "the combination of its engineers' specific skills[, which Hooked claimed] was a trade secret."[3] Hooked had alleged that Apple "learned confidential and trade secret details regarding the makeup, skills, and contributions of Hooked Media's core engineering team" during the acquisition discussions and from Venkataraman outside of those discussions. Hooked argues that Apple "necessarily used this information in its hiring" of Hooked's engineers.[4] But Apple did negate this claim. It produced evidence that Venkataraman

---

[3]     Hooked claims that its allegations did not refer to the identities and experience of its engineers, which the evidence indisputably showed was not a trade secret.

[4]     Hooked asserts that it produced evidence that Apple used confidential Hooked information about Cartoon and Irvine in its decision to hire them. However, the evidence Hooked cites reflects that Apple based its hiring decision on Apple

9

did not disclose any of Hooked's trade secret information outside of the acquisition discussions, and Apple also produced evidence that the information about Hooked's engineers disclosed to Apple during the acquisition discussions was not *improperly* acquired by Apple because it was acquired with Hooked's consent. Apple met its initial burden.

Hooked also contends that it met its own burden of demonstrating that there were triable issues of fact as to whether Apple wrongfully acquired Hooked's trade secret information. First, Hooked contends that, because Irvine, Cartoon, and Venkataraman were subject to NDAs, the possession of any Hooked information by any of them after they began working for Apple was attributable to Apple. This contention addresses solely the third set of information that Hooked alleged Apple misappropriated. But Hooked's allegation of misappropriation of this third set of information was limited to information *Venkataraman* retained after he left Hooked's employ.[5] Since Apple had produced evidence that it had not acquired any of Hooked's trade secret information from Venkataraman, Hooked's burden was to present evidence sufficient to support a finding that Apple *had* acquired Hooked's trade secret information through Venkataraman and that Apple knew or should have known that Venkataraman had acquired this information by improper means. (Civ. Code, § 3426.1, subd. (b).)

---

employees' personal "interactions" with Cartoon and Irvine during the acquisition discussions and does not imply any reliance on Hooked-provided information. Since this evidence does not support Hooked's argument, it could not have satisfied Hooked's burden of showing a triable issue.

[5] Although Hooked's general allegations asserted that Cartoon and Irvine had Hooked's information on their personal computers when they left Hooked's employ, Hooked did not allege that *this* information was misappropriated by Apple. Consequently, Hooked's attempt on appeal to rely on evidence comparing Cartoon's Apple source code to Hooked's source code could not raise a triable issue as to Hooked's pleaded misappropriation cause of action.

10

Hooked's reliance on Apple's mere employment of Venkataraman alone is inadequate because this evidence was not sufficient to satisfy Hooked's burden of making a prima facie showing that Apple had wrongfully acquired Hooked's information that was in Venkataraman's possession. Hooked argues that an inference that Apple wrongfully acquired this information from Venkataraman could be drawn from evidence that, three weeks after starting work for Apple, Venkataraman "completed a highly detailed project plan" for building a recommendations system for Apple, a timeline that, in Hooked's view, suggested Venkataraman had relied on Hooked's trade secret information. Hooked has not produced evidence that supports its claim that the fact that an experienced software engineer, who had previously created a recommendations system for Hooked, would not be able to produce a "project plan" for a new recommendations system for Apple in three weeks without employing Hooked's trade secrets to do so. Indeed, the document that Hooked identifies as a "highly detailed project plan" is a two-page outline with little detail. Hooked did not satisfy its burden.

Hooked also contends that it showed that Apple "necessarily used" Hooked's trade secret information about the talents of its engineers when Apple hired those engineers. Apple showed that the information about the talents of Hooked's engineers was not *wrongfully* acquired by Apple because Hooked freely shared that information with Apple. Apple's use of that information was not therefore a misappropriation of Hooked's trade secret, as a misappropriation requires some element of wrongfulness.

Hooked claims that it presented evidence to create a triable issue about whether Apple had promised to keep that information confidential. The evidence presented by Hooked did not reference information about the talents of Hooked's engineers. Instead, it broadly addressed information conveyed by Hooked during two acquisition meetings. Hooked's CEO testified at her deposition that, in advance of the acquisition meetings, Apple representatives told her that "Everything is confidential." While this

11

evidence suggests that the information conveyed in the acquisition meetings was "confidential," it does not support a finding that Apple agreed to or promised not to consider this information in its own hiring processes. It also does not suggest that Apple wrongfully acquired this information or that it improperly used it.

Apple satisfied its initial burden, and Hooked failed to meet its burden of showing a triable issue. The superior court properly granted Apple summary adjudication of Hooked's trade secrets cause of action.

### 3. Interference Causes of Action

Hooked argues that the superior court erred in summarily adjudicating its interference causes of action, and it insists that there was a triable issue as to whether Apple intended to and did interfere with Hooked's contract with HTC and its business relationship with Deutsche Telekom.

The elements of a cause of action for interference with contract are " '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) "[I]t is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." (*Ibid.*)

The element of a cause of action for interference with prospective economic advantage are " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." ' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134,

12

1153.)  In addition, the plaintiff must establish that the defendant's conduct was

" 'wrongful by some legal measure other than the fact of interference itself.' "  (*Ibid.*)

Hooked alleged that it had a contract with HTC executed in early 2013 and was

about to sign a contract with Deutsche Telekom in late 2013.[6]  It alleged that Apple

"was fully aware of the importance" of Cartoon, Irvine, and Venkataraman to

Hooked's contract with HTC and its relationship with Deutsche Telekom and

"intentionally interfered" with that contract and "prospective business relationship[]"

"for [Apple's] own commercial gain."  Hooked alleged that Apple's actions left

Hooked "unable to even continue its substantial work for HTC" or "sign its finalized

contract with Deutsche Telekom . . . ."  The only act of "interference" alleged was

Apple's hiring of Cartoon, Irvine, and Venkataraman.

Both interference causes of action required proof that Apple intentionally

engaged in conduct "designed" to disrupt the relationship between Hooked and the

third parties.  Apple produced evidence it hired Irvine and Cartoon only after

Hooked's CEO actively encouraged it to do so, even though she knew at that time that

the most Hooked had to gain from Apple was a finder's fee.  Apple also asked

Hooked's CEO in advance to let it know when Irvine and Cartoon "would be

available" so that it could establish a start date for them.  In addition, Apple produced

evidence that it hired Venkataraman only after Hooked's CEO terminated

Venkataraman's employment with Hooked, and Venkataraman did not start work for

Apple until more than a month later.

Apple's evidence was sufficient to make a prima facie showing that Apple's

hiring of Cartoon, Irvine, and Venkataraman was not intentionally designed to disrupt

Hooked's contractual and business relationships, a necessary element of both

---

[6]     Apple produced evidence that Apple did not know of any Hooked business relationships other than those with HTC and Deutsche Telekom, and Hooked does not claim on appeal that any other business relationships were at issue.

interference causes of action. Apple showed that it did not abruptly steal Irvine and Cartoon from Hooked. Instead, Hooked promoted its engineers to Apple, and Apple expressed interest in hiring the engineers and offered to coordinate with Hooked's CEO a mutually agreeable transition date. As to Venkataraman, Hooked terminated him, and he went to work for Apple only after his termination. Apple's actions under these conditions could not have been designed to disrupt Hooked's business relationships. Hence, the burden shifted to Hooked to produce evidence raising a triable issue.

Hooked claims that it met its burden by producing evidence that Apple knew of Hooked's business relationships and knew that it was hiring Hooked's "entire core recommendations team." It points to evidence that Apple was aware of Venkataraman's interest in joining Apple long before Hooked terminated Venkataraman's employment. This evidence does not raise a triable issue as to whether Apple intended to disrupt Hooked's business relationships. Apple hired two Hooked employees whom Hooked had encouraged Apple to hire, and Apple also hired a former Hooked employee after his termination. Nothing about these facts suggests that Apple's hiring actions were intentionally designed to disrupt Hooked's business relationships. The superior court did not err in summarily adjudicating the two interference causes of action.

### 4. Fraud and Negligent Misrepresentation Causes of Action

Hooked claims that the superior court erred in summarily adjudicating its fraud and negligent misrepresentation causes of action.

Hooked's fraud cause of action alleged that Apple (1) "made false promises that it would keep confidential" Hooked's "proprietary technology and information and not use confidential information disclosed to it during the acquisition discussions against Hooked," (2) "made false promises that it would negotiate and deal directly with Hooked Media's CEO" during the acqui-hire negotiations, and (3) "concealed its true

14

plans to use the confidential information . . . to raid Hooked Media's core engineering team . . . ." Hooked's negligent misrepresentation cause of action alleged that Apple "made multiple untrue representations of past or existing material facts" and was therefore apparently based on the same factual allegations as the fraud cause of action.

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "The tort of negligent misrepresentation does not require scienter or intent to defraud. [Citation.] It encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' (Civ. Code, § 1710, subd. 2), and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations]." (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173-174.) Like fraud, negligent misrepresentation requires reliance. (*Ibid.*)

Apple produced evidence that the acqui-hire discussions did go through Hooked's CEO exclusively, so there was no misrepresentation. It also produced evidence that Apple did not conceal its interest in hiring Irvine, Cartoon, and Venkataraman, so there was no concealment. As to Hooked's allegation that Apple had fraudulently promised "confidentiality" of the information disclosed during the acquisition discussions, Apple produced evidence that Hooked did not rely on this alleged promise. Apple's evidence showed that, in advance of the meetings between Hooked and Apple, Hooked explictly "recognized that there was a risk presenting

15

employees to Apple without an NDA and non-solicit in place" even if Apple kept its promise of confidentiality because the employees might "decide, 'I'm just going to leave Hooked and go work for Apple.' " Since Hooked's claim to have been damaged by Apple's alleged false promise of confidentiality was limited to Apple's hiring of Hooked's employees, this evidence shifted the burden to Hooked to show that it had relied on Apple's promise of confidentiality.

Hooked claims that it produced evidence that created triable issues on these points, but it fails to demonstrate that it did so. On the issue of the alleged promise to go through Hooked's CEO for all acqui-hire negotiations, Hooked claims that Apple "stopped including [Hooked's CEO] in the discussions" after she "introduced the engineers to Apple," but it provides no record citation in support of this point.[7] On the issue of the alleged promise of confidentiality, Hooked asserts: "Assuming . . . that Apple made such promises, presumably Apple would agree that Hooked could reasonably take Apple at its word. Moreover, Hooked was harmed as a result of its reliance on Apple's promise of confidentiality." Hooked offers no record citation in support of this assertion and does not otherwise address the reliance element of its fraud and misrepresentation causes of action.[8] Hooked makes no argument about its

---

[7] Hooked argues at some length that the alleged promise did not extend only to the acqui-hire negotiations but also to *all discussions* concerning Apple's possible hiring of Cartoon, Irvine, and Venkataraman. Hooked's allegations rebut this claim. Hooked alleged that, during Hooked's consideration of " 'the acqui-hire' proposal from Apple, Hooked . . . had one requirement, that all the negotiations needed to run though [Hooked's CEO]." Hooked alleged that Hooked "justifiably relied on Apple's promise to discuss the 'acqui-hire' proposal only with [Hooked's CEO]." Thus, Hooked's allegations concerning both the nature of the promise and the nature of Hooked's reliance were limited to discussion of the acqui-hire proposal.

[8] Hooked provides two record citations in its reply brief purportedly to evidence of reasonable reliance, but both record citations merely support Hooked's claim that the promise was made, not that Hooked reasonably relied on it.

16

concealment allegation. Hooked has failed to establish that the superior court erred in summarily adjudicating its fraud and misrepresentation causes of action.

### 5. Aiding and Abetting Breach of Fiduciary Duty Cause of Action

Hooked claims that Apple failed to negate any element of its cause of action alleging that Apple had aided and abetted a breach of fiduciary duty by Venkataraman.

Hooked alleged that Venkataraman "had fiduciary duties to Hooked" because he was Hooked's "CTO." It alleged that Apple knew that Venkataraman had these duties and intentionally aided and abetted him by encouraging him to breach these duties.

Aiding and abetting a breach of fiduciary duty requires proof that the defendant knew that the conduct of the other person " ' "constitute[d] a breach of duty and g[ave] substantial assistance or encouragement to the other to so act . . . ." ' " (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144.) The defendant must have "actual knowledge of the specific primary wrong the defendant substantially assisted." (*Id.* at p. 1145.)

Apple sought summary adjudication of this cause of action on the ground that Apple did not know or intend for Venkataraman to breach his alleged fiduciary duty to Hooked nor did it assist him in doing so. Apple produced evidence that, during the acquisition discussions, Venkataraman had communicated with Apple only as directed by Hooked's CEO. It also produced evidence that when Venkataraman communicated with Apple about a prospective job for himself at Apple, he told Apple that he had no obligation to remain employed by Hooked and that he had "fulfilled" his "transition responsibilities to Hooked." Apple produced evidence that it was unaware of any misconduct by Venkataraman in connection with Hooked. This evidence was sufficient to support a finding that Apple was not liable for aiding and abetting a breach of fiduciary duty by Venkataraman, and it shifted the burden to Hooked to make a showing of a triable issue.

17

Hooked claims that it met its burden by producing evidence that Apple was aware that Venkataraman was pursuing an opportunity at Apple behind the back of Hooked's CEO. However, none of the evidence Hooked cites shows that Apple was aware that Venkataraman was breaching any obligations he had to Hooked. Hooked's CEO had told Apple in mid-October 2013 that she understood that Venkataraman "possibly . . . would be part of this deal" to be hired by Apple. And Venkataraman told Apple before he left Hooked that he had told Hooked's CEO that he intended to leave Hooked soon. In this context, Hooked's evidence that Apple had decided to "pursue" Venkataraman "outside of the thing with [Hooked's CEO]" did not create a triable issue as to Apple's understanding from Venkataraman that he had no obligations to Hooked. Since Hooked failed to raise a triable issue as to whether Apple knew that Venkataraman would be breaching an obligation to Hooked by coming to work for Apple, the superior court did not err in summarily adjudicating this cause of action.

### 6. Unjust Enrichment and Unfair Competition Causes of Action

Hooked claims that the superior court erred in summarily adjudicating its unjust enrichment and unfair competition causes of action, but it largely rests its argument on its contentions as to the other causes of action.

Hooked's unjust enrichment cause of action was expressly derivative of its other causes of action and therefore could not succeed if those causes of action failed, as they did. The factual basis alleged for Hooked's unfair competition cause of action was the "misconduct . . . described herein." That is, the unfair competition cause of action, as alleged, was based on the conduct alleged in the other causes of action. Apple prevailed on all of Hooked's other claims.

Hooked asserts on appeal that its unfair competition cause of action was based not only on the conduct alleged in the other causes of action but also on some other conduct of Apple that was "unfair and significantly threatened and harmed

18

competition, by, among other things, preventing Hooked from being able to develop, market, and sell its recommendations platform in competition with Apple and continuing and expanding its business relationships." Yet Hooked's allegations below identified no conduct of Apple *other* than the "misconduct" that Hooked alleged in connection with its other causes of action.

While "a practice may be deemed unfair even if not specifically proscribed by some other law" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180), Hooked failed to allege that Apple engaged in any "unfair" business practice other than the conduct that formed the basis for Hooked's other causes of action. Apple met its burden below by defeating all of Hooked's allegations of misconduct in connection with the other causes of action. Hooked fails to identify on appeal any evidence that it produced that Apple had engaged in any specific *unfair* business practice that was not alleged as the basis for one of the other causes of action. Consequently, the superior court did not err in summarily adjudicating this cause of action.

### C. E-Discovery Costs

Hooked contends that the superior court erred in denying Hooked's motion to tax Apple's "E-Discovery Costs" because such expenses are "unavailable as a matter of law."

Apple's memorandum of costs sought recovery of over $92,000 in "E-Discovery Costs" it had paid to a "third-party vendor" for "required data conversion of native electronic files retrieved from Apple's systems (*e.g.*, Apple's e-mail, backup, and other servers) into reasonably usable form for review and production; for uploading the data and documents into a reviewable database; for creating document production sets in response to [Hooked's] discovery requests; for storing uploaded and produced documents; and for creating searchable OCR files for

19

documents for production." These costs did not include any internal costs or any attorney or paralegal costs. Hooked filed a motion to tax these costs in which it argued that these costs were not reasonably necessary to the litigation or reasonable in amount. The court rejected this argument.

" 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion. [Citation.] However, because the right to costs is governed strictly by statute [citation] a court has no discretion to award costs not statutorily authorized. [Citations.]' [Citation.] Whether a cost is statutorily authorized is a question of law we review de novo." (*Naser v. Lakeridge Athletic Club* (2014) 227 Cal.App.4th 571, 576.)

Code of Civil Procedure section 1033.5, which governs costs, neither expressly allows nor expressly disallows recovery of "E-Discovery Costs." "Items not mentioned in [Code of Civil Procedure section 1033.5] and items assessed upon application may be allowed or denied in the court's discretion." (Code Civ. Proc., § 1033.5, subd. (c)(4).) "Allowable costs shall be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5, subd. (c)(2).)

Hooked contends that the "E-Discovery Costs" awarded to Apple by the superior court were unrecoverable "as a matter of law" under *Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095 (*Science Applications*). *Science Applications* provides no support for this contention. In that case, the Court of Appeal ruled that expenses for the "cost of hiring assistants to help counsel organize documents and access them in discovery and at trial—in other words, the cost of a 'high tech' paralegal" were "not recoverable" because they were akin to noncompensable attorney's fees. (*Id.* at p. 1104.)

Here, unlike in *Science Applications*, the third-party vendor expenses incurred by Apple for data conversion of files into a "usable form" so that those files could be

produced to Hooked were not akin to paralegal or attorney expenses. The costs incurred for the technical process of converting data files into a usable form so that those files can be produced in response to document production requests was not addressed in *Science Applications*, and such costs are not addressed in Code of Civil Procedure section 1033.5. It follows that the superior court had discretion to allow or disallow these costs. Hooked makes no argument that the court abused its discretion. Therefore, Hooked's contention cannot succeed.

## IV.  Conclusion

I agree with my colleagues that the judgment and the costs order should be affirmed.

_____

Mihara, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HOOKED MEDIA GROUP, INC., | H044395, H044782 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-14-CV-265819) |
| v. | |
| APPLE INC., | |
| Defendant and Respondent. | |

BY THE COURT:

Pursuant to California Rules of Court, rule 8.1105(b), the request for publication is hereby granted.  It is ordered that the opinion in this matter filed on May 28, 2020, shall be certified for publication.

Dated:

_____
                                                    Grover, J.


_____
                                                    Elia, Acting P. J.

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. CV265819 |
|---|---|
| Trial Judge: | Hon. Mary Arand |
| Counsel for Plaintiff/Appellant<br>Hooked Media Group, Inc. | Thomas P. Murphy<br>  Berliner Cohen, LLP<br>Zarchary James Alinder<br>Ellen Peitse Liu<br>Rebecca Keiko Felsenthal<br>  Sideman & Bancroft LLP |
| Counsel for Defendant/Respondent<br>Apple Inc. | David Robert Eberhart<br>James K. Rothstein<br>Daniel Levy<br>  O'Melveny & Myers LLP<br>Anna-Rose Mathieson<br>  California Appellate Law Group LLP<br>Jeffrey Michael Judd<br>  Judd Law Group |

H044395, H044782 - *Hooked Media Group, Inc. v. Apple Inc.*